UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/26/2023
```

---------------------------------------------------------------------X
                                   :

V.A. *on behalf of herself and on behalf of her infant child*  :
*O.A.*,  :
  :
                        Plaintiffs,  :          22-cv-773 (LJL)
  :
             -v-                  :           <u>ORDER</u>
  :
THE CITY OF NEW YORK, JEWISH BOARD OF  :
FAMILY AND CHILDREN'S SERVICES, SCO  :
FAMILY OF SERVICES, JEWISH CHILD CARE  :
ASSOCIATION OF NEW YORK, and NAOMI  :
CUDJOE,  :
  :
                     Defendants.  :
  :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants the City of New York and Naomi Cudjoe (the "City Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing the amended complaint, Dkt. No. 65 ("Amended Complaint"), against them.  Dkt. No. 83.  Defendant Jewish Board of Family and Children's Services ("JBFCS") also moves to dismiss the Amended Complaint against it pursuant to Federal Rule of Civil Procedure 12(b)(6) and moves to dismiss the cross-claims of SCO Family of Services ("SCO") against it.  Dkt. No. 79.

For the following reasons, the City Defendant's the motion to dismiss is granted. Because the Court declines to exercise supplemental jurisdiction over the state law claims in this action, it does not address the merits of JBFCS's motion to dismiss the Amended Complaint or its motion to dismiss the cross-claims against it.

# BACKGROUND

The Court accepts as true for purposes of these motions the well-pleaded factual allegations of the Amended Complaint and the documents incorporated by reference therein.

## I.     The Parties

Plaintiff V.A. ("V.A." or "Plaintiff") is the mother and natural guardian of her son Plaintiff O.A. (the "Infant-Plaintiff" and, together with Plaintiff, "Plaintiffs"), on whose behalf she brings this case.  Dkt. No. 65 ¶ 5.

The Administration for Child Services ("ACS") is a department or agency of defendant the City of New York; is authorized by New York State law to provide and/or coordinate care for children in foster care; and is responsible for the appointment, training, supervision, promotion, and discipline of case workers and supervisory case workers under its supervision.  *Id.* ¶¶ 7–9.  Naomi Cudjoe ("Cudjoe") was, at all relevant times, a Child Protective Manager for ACS, and an employee and agent of ACS.  *Id.* ¶ 13.

Defendants JBFCS, SCO, and Jewish Child Care Association of New York ("JCCA") are all "authorized agencies" under New York State law.  *Id.* ¶¶ 10–12.  Defendants City of New York, Cudjoe, JBFCS, SCO, and JCCA are collectively referred to as "Defendants."

## II.    The Voluntary Placement of Infant-Plaintiff With ACS

In September 2016, Plaintiff voluntarily placed Infant-Plaintiff into the custody of ACS.  *Id.* ¶ 25.  She did so after Infant-Plaintiff had disclosed to her that he had been sexually abused by an older paternal cousin and after Plaintiff concluded that the out-patient services that she had enrolled Infant-Plaintiff in were insufficient to address his sexual trauma.  *Id.* ¶¶ 19, 21.  She thus sought more intensive services for Infant-Plaintiff.  *Id.* ¶¶ 22, 24.

Specifically, on or about September 23, 2016, Plaintiff executed a voluntary placement agreement (the "Voluntary Placement Agreement") with ACS, pursuant to New York Social

Services Law § 384-a, which voluntarily placed Infant-Plaintiff into the care and custody of

ACS.  *Id.* ¶ 25.[1]  Plaintiff alleges she placed Infant-Plaintiff into foster care to address his known

mental health issues, which included Oppositional Defiant Disorder ("ODD"), Attention Deficit

Hyperactivity Disorder ("ADHD"), Post-Traumatic Stress Disorder ("PTSD"), and Major

Depressive Disorder.  *Id.* ¶ 26.  The Voluntary Placement Agreement specified that Infant-

Plaintiff would be placed with ACS on an event-limited placement, until his aggressive

conditions and tendencies stabilized.  *Id.* ¶ 28; Dkt. No. 38-1 at ECF pp. 7–8.[2]  The Voluntary

---

[1] New York Social Services Law § 384-a permits a parent or guardian to transfer the care and custody of a child to an authorized agency by written instrument on such terms as may be agreed by the parties, including that the child be returned "on a date certain or upon the occurrence of an identifiable event."  N.Y.S.S.L. § 384-a(1), (2).

[2] The Voluntary Placement Agreement is incorporated by reference into the Amended Complaint and thus it is properly considered in these motions.  "'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inv. v. Sum Holding*, 949 F.2d 42, 47–48 (2d Cir. 1991)).  "As a necessary corollary to the foregoing principles, a plaintiff cannot avoid judicial consideration of a document upon which it bases its complaint by the expedient refusal to attach it to the pleading or refer to it *in haec verba*."  *Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y. Sept. 20, 2021).  "Where a plaintiff has 'reli[ed] on the terms and effect of a document in drafting the complaint,' and that document is thus 'integral to the complaint,' we may consider its contents even if it is not formally incorporated by reference."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original).  *See Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 2023 WL 35176, at *5 (S.D.N.Y. Jan. 4, 2023).

Here, though the Amended Complaint does not attach the Voluntary Placement Agreement, the Amended Complaint relies on the terms and effects of the Voluntary Placement Agreement for its substantive allegations.  *See, e.g.*, Dkt. No. 65 ¶¶ 26, 33, 45, 95, 136.  As such, the Amended Complaint incorporates the Voluntary Placement Agreement by reference, and the entire document is properly considered on these motions.  For similar reasons, the Court finds that the Amended Complaint also incorporates the Order of Disposition, Dkt. No. 38-2, the September 30, 2020 neglect petition, Dkt. No. 38-3, and the September 30, 2020 order directing the temporary removal of Infant-Plaintiff, Dkt. No. 38-4 by reference and that it can properly considered on these motions.

Alternatively, the Court can take judicial notice of the family court records.  *See Licorish-Davis*

Placement Agreement expressed the understanding that it would be the responsibility of ACS to "[p]rovide appropriate care, supervision, room, board, clothing, and arrange for medical care, dental care, and education services" for Infant-Plaintiff.  *Id.* at ECF p. 9.  It also gave ACS the authority to contract with a foster care agency to perform some of its responsibilities under the agreement.  *Id.* at ECF p. 10.  It further reflected the understanding that if ACS believed that it was likely that Infant-Plaintiff was to remain in foster care for more than 30 days, ACS would ask the family court for a hearing to review the Voluntary Placement Agreement.  *Id.* at ECF p. 8.

Prior to signing the Voluntary Placement Agreement, Plaintiff told certain ACS employees that Infant-Plaintiff needed intensive services to address his past sexual trauma, Dkt. No. 65 ¶ 30, and ACS told Plaintiff that it could address those issues in a therapeutic setting, *id.* ¶ 31.

On September 29, 2016, ACS petitioned the family court for approval of the Voluntary Placement Agreement.  *See* Dkt. No. 38-1.  Among other things, the petition reflected that the Infant-Plaintiff had mental health issues and was diagnosed with ODD, ADHD, PTSD, and major depressive disorder and that he had engaged in destructive and threatening behavior.  *Id.* at ECF p. 2

---

*v. Mitchell*, 2013 WL 2217491, at *1 (S.D.N.Y. May 20, 2013) (concluding that the court could take judicial notice of related family court documents); *In re Dayton*, 786 F. Supp. 2d 809, 814 (S.D.N.Y. 2011) (collecting cases and concluding that the court could take judicial notice of family court records submitted by the defendants).  Though the court can "take judicial notice of documents filed in other courts," it cannot do so "for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Notably, Plaintiffs do not object to the Court considering these documents on these motions.  *See generally* Dkt. No. 90; *see also id.* at 12, 15 (citing to the Petition and Cudjoe's addendum to that petition in support of their argument).

On or about November 21, 2016, the New York County Family Court approved the Voluntary Placement Agreement and entered an Order of Disposition, formally placing Infant-Plaintiff in foster care with ACS to address his mental health needs.  Dkt. No. 65 ¶ 45; Dkt. No. 38-2.  Infant-Plaintiff remained in the care of ACS until on or about April 14, 2021, when Infant-Plaintiff was ordered returned to Plaintiff.  Dkt. No. 65 ¶ 145.  The remainder of this section reviews the allegations concerning the time period between when Infant-Plaintiff was placed with the first of three foster care agencies through the events leading up to the filing of a neglect petition by ACS.[3]

### A.      Infant-Plaintiff's Placement with JBFCS

During the time Infant-Plaintiff was in the custody of ACS, Infant-Plaintiff received allegedly deficient care from a number of foster care agencies with whom he was placed.  The first institution where Infant-Plaintiff resided was the Nery Ittleson Center, which was run by Defendant JBFCS.  *Id.* ¶¶ 52–53.  On or about March 30, 2017, ACS placed Infant-Plaintiff into the care and custody of JBFCS and entered into a contract with JBFCS for it to provide foster care to Infant-Plaintiff.  *Id.* ¶¶ 48–49.  Plaintiff alleges that, by accepting the placement from ACS, JBFCS assumed a legal duty to provide for the health, safety, and/or general welfare of Infant-Plaintiff and that a special relationship was created between JBFCS and Infant-Plaintiff. *Id.* ¶¶ 50–51

Infant-Plaintiff remained in the custody of JBFCS until early 2018.  *Id.* ¶ 59.  Despite recognizing the need to address Infant-Plaintiff's history of being sexually molested and agreeing to address it, JBFCS never addressed that trauma with Infant-Plaintiff and failed to treat Infant-

---

[3] The Amended Complaint alleges that after the approval of the Voluntary Placement Agreement on November 21, 2016, Infant-Plaintiff was placed in foster care with ACS.  Dkt. No. 65 ¶ 45. In January 2017, Infant-Plaintiff was discharged from foster care to Plaintiff, but shortly thereafter required psychiatric hospitalization and was returned to foster care.  *Id.* ¶ 46.

Plaintiff's history of sexual trauma. *Id.* ¶¶ 45–57. During his time at JBFCS, Infant-Plaintiff's

behavior deteriorated and he began having fecal[4] incontinence. *Id.* ¶¶ 58–59.

### B.   Infant-Plaintiff's Placement with SCO

In early 2018, ACS and/or JBFCS had planned to trial discharge Infant-Plaintiff to

Plaintiff. *Id.* ¶ 59. However, as a result of Infant-Plaintiff's behavior, which included outbursts

and fecal incontinence, ACS instead looked for a different residential placement. *Id.*

On or about March 21, 2018, ACS placed Infant-Plaintiff into the care and custody of

Defendant SCO. *Id.* ¶ 61. SCO managed, owned, operated, leased, maintained, and/or

controlled an adolescent residential facility known as Our Children's Community Residential

Center ("Community Residence"), *id.* ¶ 65, and ACS and/or SCO designated the Community

Residence as the location of Infant-Plaintiff's foster care placement and to provide his mental

health services, *id.* ¶ 66. Plaintiff alleges that, by accepting the placement from ACS, SCO

assumed a legal duty to provide for the health, safety, and/or general welfare of Infant-Plaintiff

and that a special relationship was created between SCO and Infant-Plaintiff. *Id.* ¶¶ 63–64.

However, SCO—which was advised by Plaintiff during the intake process of Infant-

Plaintiff's history of being sexually abused and the need for treatment to address that trauma and

indicated it could provide the proper treatment and care for Infant-Plaintiff—never provided any

treatment to address Infant-Plaintiff's history of sexual trauma. *Id.* ¶¶ 67, 69–70. Instead of

assisting Infant-Plaintiff with his fecal incontinence, the SCO staff made fun of Infant-Plaintiff

and embarrassed him in front of the other children. *Id.* ¶ 71. Throughout the remainder of 2018,

Infant-Plaintiff's condition continued to deteriorate. *Id.* ¶ 72. His fecal incontinence and overall

---

[4] The Amended Complaint alleges that Infant-Plaintiff had "fetal incontinence." *Id.* ¶ 58.
However, it is clear from the next paragraph that Plaintiff intended to allege that he had "fecal
incontinence." *Id.* ¶ 59.

hygiene worsened, he displayed aggressive behavior towards SCO personnel, and he was difficult to control while on home visits.  *Id.*

In November 2018, based on SCO's failure to treat or keep safe Infant-Plaintiff, Plaintiff removed her son from SCO and attempted to care for him at her home.  *Id.* ¶ 73.  Although Infant-Plaintiff was still in ACS's care at Plaintiff's home, ACS put no services in place for Infant-Plaintiff.  *Id.* ¶ 74.  On or about December 1, 2018, Infant-Plaintiff required emergency psychiatric hospitalization.  *Id.* ¶ 75.  In approximately the spring of 2019, ACS had a case worker begin visiting the home, and in or about May 2019, while an ACS worker and a case worker were visiting the home, Infant-Plaintiff suffered a severe episode requiring another emergency psychiatric hospitalization.  *Id.* ¶¶ 76–77.

### C.    Infant-Plaintiff's Placement With JCCA

On or about August 5, 2019, ACS placed Infant-Plaintiff into the care and custody of Defendant JCCA, which it had identified as a foster care agency for the residential placement and provision of services to Infant-Plaintiff.  *Id.* ¶¶ 78–79.  JCCA managed, owned, operated, leased, maintained, and/or controlled an adolescent residential treatment facility known as Pleasantville Cottage School ("Pleasantville") and ACS and/or JCCA designated Pleasantville as the location of Infant-Plaintiff's foster care placement and for provision of mental health services.  *Id.* ¶¶ 83, 87.  Plaintiff told the JCCA intake team that Infant-Plaintiff needed intensive services to address his history of being sexually abused and the JCCA intake team told Plaintiff that it would address Infant-Plaintiff's sexual trauma and that JCCA had a special program called the Center for Healing to address sexual trauma.  *Id.* ¶¶ 84–85.  Plaintiff alleges that by accepting the placement from ACS, JCCA assumed a legal duty to provide for the health, safety, and/or general welfare of Infant-Plaintiff and that a special relationship was created between JCCA and Infant-Plaintiff.  *Id.* ¶¶ 81–82.

Plaintiff alleges that, despite JCCA's representation that it would address Infant-Plaintiff's sexual trauma, months went by before a mental health counselor was assigned to Infant-Plaintiff. *Id.* ¶ 86. Despite multiple psychiatric hospitalizations over the prior year and evaluations demonstrating an urgent need for more intensive mental health services, Infant-Plaintiff's mental health services at Pleasantville did not begin until in or about November 2019. *Id.* ¶ 87. Just one month later, his therapist left JCCA and was not replaced. *Id.* JCCA advised Plaintiff that it would quickly assign a new mental health counselor to treat Infant-Plaintiff for sexual trauma but, despite that representation, no other mental health counselor was ever assigned; in total, Infant-Plaintiff was provided a therapist for only one month during his entire placement at Pleasantville. *Id.* ¶¶ 88–90.

**D.      The Trial Discharge of Infant-Plaintiff to Plaintiff**

In or about March 2020, with the start of the COVID-19 pandemic, Infant-Plaintiff was trial discharged from Pleasantville to Plaintiff. *Id.* ¶ 96. No in-home services were put in place other than services to help with the provision of medication. *Id.* Even though JCCA still maintained custody of Infant-Plaintiff, JCCA did not assign a new mental health counselor, did not provide remote treatment to Plaintiff or Infant-Plaintiff, and, except for providing medication, did not provide any services to Plaintiff or Infant-Plaintiff. *Id.* ¶¶ 97–98. Over the ensuing months, Infant-Plaintiff continued to exhibit disruptive and defiant behavior, which caused Plaintiff to again fear for her health and safety and that of her son and the other children in the household, *id.* ¶ 102, but ACS and JCCA failed to provide or assist in providing mental health services to Infant-Plaintiff and negligently delayed the implementation of such services, including family therapy and/or trauma therapy, *id.* ¶ 103.

In May 2020, Plaintiff's mother—Infant-Plaintiff's grandmother—passed away from COVID-19, and JCCA was informed of this traumatic incident. *Id.* ¶¶ 104–05. However,

neither JCCA nor ACS offered any additional services or bereavement counseling.  *Id.* ¶ 105.  In June 2020, ACS and/or JCCA formalized what had previously been characterized as a "vacation" to a "trial discharge," but still failed to ensure mental health services aside from help administering medication.  *Id.* ¶ 107.  ACS and/or JCCA only checked in periodically with the family without saying more than five minutes and never entering the home.  *Id.* ¶¶ 107–08.

## III.   The Events Leading Up to the Neglect Petition and the Neglect Petition

The events of central importance to this lawsuit and to the instant motions occurred in August and September 2020.  On August 25, 2020, after Infant-Plaintiff had a violent episode in Plaintiff's home, he was taken to Cohen's Children's Hospital.[5]  *Id.* ¶ 110.  At approximately 3:00 a.m. on August 26, 2020, Cohen's Children's Hospital called Plaintiff to release Infant-Plaintiff to her care.  *Id.* ¶ 111.  Plaintiff told Cohen's Children's Hospital that she was a single mother with two young children, who were sleeping and would be unable to pick up Infant-Plaintiff because she did not feel comfortable waking up her young children and taking them to the hospital in the middle of the night at the height of the COVID-19 pandemic.  *Id.* ¶ 112.  Infant-Plaintiff was escorted from the hospital to Plaintiff's home that night and was received into Plaintiff's care.  *Id.* ¶ 112.  Two days later, on or about August 28, 2020, Infant-Plaintiff was sent back to Pleasantville for residential foster care treatment.  *Id.* ¶ 114.

On September 4, 2020, an Initial Child Safety Conference was held regarding Infant-Plaintiff.  *Id.* ¶ 115.  Plaintiff, Infant-Plaintiff, Defendant Cudjoe (who was a supervisor at ACS), a second ACS representative, a representative from JCCA, and multiple representatives from NY Foundling[6] were all in attendance.  *Id.* ¶ 116.  Various positive things were said about Plaintiff at

_____

[5] Though references in the Amended Complaint to "Cohen's Children's Hospital" are likely intended to refer to "Cohen Children's Medical Center," which is located in Brooklyn, the Court will refer to the hospital by the name given to it by Plaintiffs.

[6] The Amended Complaint does not allege what NY Foundling is and why it was present at the

the conference. *Id.* ¶¶ 117, 119–20.  In addition, an ACS representative stated that Infant-Plaintiff had been well-behaved since returning to Pleasantville, even without his medication, and a JCCA representative stated that Infant-Plaintiff was no longer a candidate for the Centers for Healing.  *Id.* ¶¶ 118, 121.  Shortly after the conference, a nurse practitioner with JCCA named Christine Lundi ("Lundi") told Plaintiff that she recommended keeping Infant-Plaintiff off of medication because he appeared to be doing well without it.  *Id.* ¶ 124.

On or about September 30, 2020, ACS filed a neglect petition (the "Petition") before the Queens Family Court.  *Id.* ¶ 134.  The Petition was filed by an attorney in the office of the New York Corporation Counsel and was verified by Cudjoe, who swore that she was an employee of ACS familiar with the facts and circumstances of the proceeding and that she believed the facts stated in the petition to be true, except for those facts alleged to be upon information and belief.  Dkt. No. 38-3 at ECF p. 4.  The Petition alleged that Infant-Plaintiff was a neglected child and attached an addendum (the "Addendum") that purported to set forth facts in support of that claim.  *See id.* at ECF pp. 2, 5–6.

The Addendum stated that Plaintiff failed to provide Infant-Plaintiff with medical care though "she was financially able to do so or had been offered financial or other reasonable means to do so," *id.* at ECF p. 5 ¶ 1; that, after Infant-Plaintiff was trial-discharged to Plaintiff in June 2020, "she failed to ensure the subject child was taking his prescribed medication as required and failed to inform the foster care agency that the child was not taking his medication," *id.* at ECF p. 5 ¶ 1(c); that, on August 25, 2020, Plaintiff threatened to hit Infant-Plaintiff with a bat and, after he left home and was taken to Cohen's Children's Hospital, Plaintiff refused to pick up Infant-Plaintiff, *id.*; that later, on August 29, 2020, Infant-Plaintiff, after another violent episode,

conference.

was placed at JCCA and JCCA determined that Infant-Plaintiff had not been taking medication since on or about June 2020 and needed medication to treat his ADHD, *id.* at ECF p. 5 ¶ 1(d); and that Lundi and Infant-Plaintiff's social worker, Brian Freeman, reported that in September 2020, Plaintiff had sent a letter to JCCA asking for Infant-Plaintiff to be returned to her care and that she did not want him to take any medication despite having previously expressed that she was afraid for the safety of her other children when Infant-Plaintiff was unmedicated. *Id.* at ECF p. 6 ¶ 1(e).

Plaintiffs claim that the information provided by Cudjoe about Plaintiff and Infant-Plaintiff was false. Specifically, Plaintiffs allege that Cudjoe falsely claimed that Plaintiff had failed to inform the foster care agency that Infant-Plaintiff was not taking his medication, that Plaintiff had threatened to hit Infant-Plaintiff with a bat, that Plaintiff had refused to pick up Infant-Plaintiff from Cohen's Children's Hospital, and that JCCA had determined that Infant-Plaintiff needed medication management to treat his ADHD. Dkt. No. 65 ¶¶ 125–26, 128–30. The Amended Complaint contains three allegations with respect to Cudjoe's knowledge that this information was false. First, the Amended Complaint alleges that "JCCA had told Defendant Cudjoe during the September 4, 2021 Initial Child Safety Conference that Infant-Plaintiff had been well behaved since returning to Pleasantville, even without medication." *Id.* ¶ 131. Next, the Amended Complaint alleges that "JCCA had told Plaintiff that JCCA thought Infant-Plaintiff was doing well without medication and they should try to keep him off of the medication." *Id.* ¶ 132. Finally, it alleges that "ACS and Defendant Cudjoe knew that Plaintiff had not neglected Infant-Plaintiff's care."[7] *Id.* ¶ 140.

---

[7] The Amended Complaint also alleges that the circumstances surrounding Infant-Plaintiff's release from Cohen's Children's Hospital were more nuanced than the Petition suggests. *Compare* Dkt. No. 65 ¶¶ 111–14, *with* Dkt. No. 38-3 at ECF p. 5 ¶ 1(c). However, there are no

The family court entered an order directing the temporary removal of Infant-Plaintiff on September 30, 2020.  Dkt. No. 38-4.  The court found that Infant-Plaintiff's interests required protection pending a final order of disposition and that continuation of Infant-Plaintiff in Plaintiff's home "would be contrary to the welfare and best interests of the child" and thus temporary removal was "necessary to avoid imminent risk" to Infant-Plaintiff's life and health. *Id.* at ECF p. 1.  The court scheduled a permanency hearing for May 17, 2021.  *Id.*  On or about October 21, 2020, ACS formally withdrew the voluntary placement that had remained pending before the New York County Family Court and Infant-Plaintiff's physical placement remained at Pleasantville.  *Id.* ¶ 143.

Plaintiff requested an immediate return of Infant-Plaintiff to her care and custody pursuant to Family Court Act § 1028.  *Id.*¶ 144.  An emergency hearing was conducted over numerous days.  *Id.*  On or about April 14, 2021, the Honorable Gilbert Taylor granted Plaintiff's application and returned Infant-Plaintiff to the care and custody of Plaintiff over the objection of ACS.  *Id.*¶ 145.  Judge Cherry[8] found, as a threshold issue, that returning Infant-Plaintiff to his mother's care would not place him at imminent risk to his life or health and, specifically, that Defendants had failed to timely or adequately put services in place for Infant-Plaintiff.  *Id.*¶ 145. On or about May 20, 2021, the neglect proceeding was dismissed in full favor of Plaintiff. *Id.*¶ 146.

## IV.   Claims Alleged

The Amended Complaint brings seven causes of action: Malicious Prosecution against Cudjoe, *id.* ¶¶ 147–50 ("Count One"); Interference with Right to Intimate Association against

---

allegations with respect to Cudjoe's knowledge of these differences.

[8] The Amended Complaint alleges that Judge Cherry made this finding and that Judge Taylor granted the application.

Cudjoe, *id.* ¶¶ 151–57 ("Count Two"); State Law Malicious Prosecution against the City of New York and Cudjoe, *id.* ¶¶ 158–65 ("Count Three"); Substantive Due Process Violation against Cudjoe, *id.* ¶¶ 166–73 ("Count Four"); Denial of a Right to a Fair Trial against Cudjoe, *id.* ¶¶ 174–78 ("Count Five"); Negligence against all Defendants, *id.* ¶¶ 179–98 ("Count Six"); and Loss of Services against the City of New York, Cudjoe, SCO, and JCCA, *id.* ¶¶ 199–203 ("Count Seven").  Plaintiffs seek compensatory and punitive damages, costs, and attorneys' fees. *Id.*, Prayer for Relief.

## PROCEDURAL HISTORY

Plaintiff V.A. initiated this action by a complaint that was accepted for filing on February 15, 2022.[9]  Dkt. No. 3.  As originally pleaded, the complaint asserted claims for (1) malicious prosecution against Cudjoe; (2) interference with the right to intimate association against Cudjoe; (3) state law malicious prosecution against the City of New York and Cudjoe; (4) substantive due process violations against Cudjoe; (5) denial of the right to a fair trial against Cudjoe; (6) negligence against all Defendants; (7) negligent infliction of emotional distress against all Defendants; and (8) loss of services against all Defendants.  *Id.* ¶¶ 83-151.

SCO answered on April 20, 2022 and filed cross-claims against JBFCS, JCCA, and Cudjoe.  Dkt. No. 23.  JCCA answered on June 14, 2022, and filed cross-claims against the City of New York, SCO, and Cudjoe.  Dkt. Nos. 41, 73.  On June 10, 2022, the City Defendants filed a motion to dismiss the complaint and to stay discovery.  Dkt. No. 36.  On June 15, 2022, JBFCS filed a motion to dismiss the complaint and the cross-claims brought against it by SCO.  Dkt. No. 48.

---

[9] Plaintiffs attempted to file the complaint on January 28, 2022, but it was rejected by the Clerk of Court for a filing error.  Dkt. No. 1.

In response, on August 5, 2022, Plaintiffs filed the Amended Complaint. Dkt. No. 65.[10]

As indicated, the Amended Complaint asserts seven of the eight claims asserted in the complaint

against the same Defendants.[11]  *Id.* ¶¶ 147–203.  On September 9, 2022, the City Defendants and

JBFCS filed these motions to dismiss along with supporting declarations and memoranda of law.

Dkt. Nos. 79–81, 83–84.  On October 28, 2022, Plaintiffs filed memoranda of law in opposition

to the motion to dismiss of the City Defendants, Dkt. No. 90, and to the motion to dismiss of

JBFCS, Dkt. No. 86.  On November 18, 2022, the City Defendants filed a reply memorandum of

law along with a declaration in further support of its motion to dismiss.  Dkt. Nos. 95–96.  On

that same date, JBFCS also filed a reply memorandum of law.  Dkt. No. 91.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic

recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement."  *Twombly*, 550 U.S. at 555.  The ultimate question is whether "[a] claim has

facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S.

at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

---

[10] JCCA has filed an answer and a cross-claim against the City Defendants and SCO.  Dkt. No. 73.  SCO filed an answer to the Amended Complaint and cross-claims against JBFCS and JCCA on October 25, 2022.  Dkt. No. 89.

[11] The Amended Complaint does not state a claim for negligent infliction of emotional distress.

common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

The City Defendants move to dismiss the federal claims against them.  First, the City Defendants argue that the Amended Complaint fails to state a claim under the Fourteenth Amendment to the United States Constitution—both for violations of substantive due process and Plaintiff's right to intimate association—because "Plaintiffs fail to show that ACS' conduct was shocking, arbitrary, and egregious" due, in part, to the fact that "the removal was effectuated pursuant to a valid family court order."[12]  Dkt. No. 84 at 8.  Second, the City Defendants argue that Plaintiffs have failed to state a claim for violation of their right to a fair trial because it is duplicative of their malicious prosecution claim and the Amended Complaint lacks sufficient allegations to state a procedural due process claim.  *Id.* at 10.  Finally, the City Defendants argue that the Amended Complaint fails to state a claim for malicious prosecution because it fails to allege that Cudjoe lacked probable cause to believe the prosecution would succeed or that they acted with malice, *id.* at 11, and it does not allege that Plaintiffs were taken into custody, *id.* at 11 n.2.[13]  The City Defendants argue that the claims against Cudjoe fail for an independent reason: She is shielded by qualified immunity.  *Id.* at 13.  Plaintiffs dispute each of these arguments.  *See* Dkt. No. 90.

---

[12] Though the City Defendants' briefing refers to actions taken by ACS, the federal allegations are all made against Cudjoe and not against the City of New York.

[13] The City Defendants also move to dismiss Plaintiffs' state-law malicious prosecution claim. However, because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law causes of action, *see infra* Section V, it does not address the state-law malicious prosecution claim.

The Court first addresses Plaintiff's federal law claims in the order in which they are alleged in the Amended Complaint.

## I.      Count One: Malicious Prosecution

Plaintiff brings claims for malicious prosecution under federal law against Cudjoe pursuant to 42 U.S.C. § 1983.  *See* Dkt. No. 148.  Specifically, the Amended Complaint alleges that Cudjoe violated Infant-Plaintiff's rights to be free from malicious prosecution under the Fourth Amendment (as incorporated against the states by the Fourteenth Amendment) by instituting neglect proceedings, which were eventually resolved in Plaintiffs' favor, in September 2020 with malice and without any basis for doing so.  *Id.* ¶¶ 148–49.  As noted, the City Defendants argue that Cudjoe had a reasonable basis for initiating the proceeding.  Dkt. No. 84 at 12.

"It is not settled in the Second Circuit whether the initiation of child neglect proceedings can give rise to a malicious prosecution claim [under 42 U.S.C. § 1983]."  *Grullon v. Admin. for Children's Servs.*, 2021 WL 981848, at *10 (S.D.N.Y. Mar. 16, 2021); *see Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015) ("[T]he law in our Circuit is unsettled as to whether child removal proceedings can give rise to a federal claim for malicious prosecution of a parent.").  However, "the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim."  *Kurtz v. Hansell* ("*Kurtz I*"), 2021 WL 1143619, at *13 (S.D.N.Y. Mar. 24, 2021); *see Johnson v. City of New York*, 2022 WL 6564685, at *10–11 (S.D.N.Y. Aug. 12, 2022), *report and recommendation adopted*, 2022 WL 4364879 (S.D.N.Y. Sept. 21, 2022), *aff'd*, 2023 WL 3607219 (2d Cir. May 24, 2023) (summary order) (same).  Here, Infant-Plaintiff was removed from the custody of Plaintiff from September 2020 to April 2021 and Plaintiff was denied the care and custody of her child during that time.  "That impingement

is substantial enough to support a claim for malicious prosecution." *Kurtz I*, 2021 WL 1143619, at *13; *see also Grullon*, 2021 WL 981848, at *9 ("The Second Circuit has held that 'the state's assumption of custody to protect a child constitutes a seizure under the Fourth Amendment.'" (citation omitted)).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). "[T]o establish a malicious prosecution claim under New York law, a plaintiff is 'required to show the following: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice[,] and[ ] (4) the matter terminated in plaintiff's favor."'" *Grullon*, 2021 WL 981848, at *11 (quoting *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016)); *see also Kee v. City of New York*, 12 F.4th 150, 161–62 (2d Cir. 2021); *Johnson*, 2022 WL 4364879, at *4. "When raising a malicious prosecution claim under Section 1983, a plaintiff must also show a 'seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004); *see Kurtz v. Hansell* ("*Kurtz II*"), 2023 WL 2648190, at *8 (S.D.N.Y. Mar. 27, 2023).

"In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (citation omitted). Although probable cause

17

is "a more exacting standard than the standard required to support an arrest," *Kurtz II*, 2023 WL 2648190, at *8 (citation omitted), the Appellate Division has stated that "when the underlying action is civil in nature[,] the want of probable cause must be patent," *Fink v. Shawangunk Conservancy, Inc.*, 790 N.Y.S.2d 249, 250 (3d Dep't 2005); *see also Kurtz II*, 2023 WL 2648190, at *8. "[T]he issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the burden of pleading facts sufficient to overcome it." *Emanuel v. Griffin*, 2015 WL 1379007, at *9 (S.D.N.Y. Mar. 25, 2015) (quoting *Butler v. Ratner*, 619 N.Y.S.2d 871, 874 (3d Dep't 1994)); *see also Grullon*, 2021 WL 981848, at *11. "That presumption 'is rebuttable, and may be overcome by evidence establishing that the [] witnesses have not made a complete and full statement of facts . . . [,] that they have misrepresented or falsified evidence[,] . . . or otherwise acted in bad faith.'" *Kurtz II*, 2023 WL 2648190, at *8 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). "Courts 'must consider those facts available to the officer at the time of' her actions." *Id.* at *8 (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "But to succeed on a malicious prosecution claim after an indictment or other judicial imprimatur, a plaintiff 'must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Kurtz I*, 2021 WL 1143619, at *14 (quoting *Boyd*, 336 F.3d at 76). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).

The family court entered an order on September 30, 2020, directing the temporary removal of Infant-Plaintiff. *See* Dkt. No. 38-4. That order found that Infant-Plaintiff's interests required protection pending a final order of disposition, that continuation of Infant-Plaintiff in

Plaintiff's home "would be contrary to the welfare and best interests of the child," and that temporary removal was "necessary to avoid imminent risk" to Infant-Plaintiff's life and health. *Id.* at 1.  That order establishes a presumption of probable cause unless Plaintiff can allege that Cudjoe made "intentionally or recklessly false," submissions to the family court that were contrary to the facts available to her at the time of the statements.  *Kurtz II*, 2023 WL 2648190, at *8 (quoting *Estiverne v. Esternio-Jensen*, 833 F. Supp. 2d 356, 379 (E.D.N.Y. 2011)).

Plaintiffs argue that the Petition was based on knowingly false statements and thus the City Defendants cannot demonstrate probable cause.  *See* Dkt. No. 90 at 14.  Specifically, the Amended Complaint alleges that Cudjoe falsely claimed that Plaintiff had failed to inform the foster care agency that Infant-Plaintiff was not taking his medication, Dkt. No. 65 ¶ 126, falsely claimed that Plaintiff had threatened to hit Infant-Plaintiff with a bat, *id.* ¶ 128, falsely claimed that Plaintiff had refused to pick up Infant-Plaintiff from Cohen's Children's Hospital, *id.* ¶ 129, and falsely claimed that JCCA had determined that Infant-Plaintiff needed medication management to treat his ADHD, *id.* ¶ 130.

The Amended Complaint, however, fails to allege any non-conclusory facts that Cudjoe knew that any of these statements were untrue or that they were inconsistent with information available to Cudjoe at the time.  The statement regarding Plaintiff having failed to inform the foster care agency that Infant-Plaintiff was not taking his medication appears in paragraph 1(b) of the addendum to the Petition.  *See* Dkt. No. 38-3 at ECF p. 5 ¶ 1(b).  That paragraph reads in relevant part:  "According to the respondent mother, on or about June 2020, she failed to ensure that the subject child was taking his prescribed medication as required and failed to inform the foster care agency that the child was not taking his medication."  *Id.*  In context, the paragraph suggests that this information came from JCCA; the paragraph begins with "[a]ccording to the

foster care agency [JCCA]." *Id.* Plaintiff alleges that this information was false because she told Brian Freeman, a social worker with JCCA, and JCCA itself that Infant-Plaintiff had refused to take his medication. Dkt. No. 65 ¶¶ 99, 127. But there is no allegation that Cudjoe—who was with ACS—knew that the information was false or was in a position to know what was said or not said to JCCA.

The second statement is contained in Paragraph 1(c) of the Petition. It states: "According to the respondent mother on or about August 25, 2020, the respondent mother threatened to hit the subject child with a bat." Dkt. No. 38-3 at ECF p.5 ¶ 1(c). Plaintiff alleges that the claim was false, but she does not deny that she threatened Infant-Plaintiff with a bat or that Cudjoe would have had any reason to know that information. *See* Dkt. No. 65 ¶ 128. In fact, she elsewhere admits that there was a violent episode in her home on August 25, 2020. *Id.* ¶ 110. After that violent episode, Infant-Plaintiff was taken to Cohen's Children's Hospital. *Id.* Those events form the basis for the third statement, which is also found in Paragraph 1(c). That statement reads: "According to Cohen['s] Children's hospital they assessed the subject child and called the respondent mother to pick up the subject child [] but the respondent mother refused. The respondent mother admits she refused to pick up the subject child from Cohen['s] Children's hospital." Dkt. No. 38-3 at ECF p. 5 ¶ 1(c). While she states that the claim was "false," Dkt. No. 65 ¶ 129, her allegations do not establish the falsity of the statement. Plaintiff does not dispute that she refused to pick up Infant-Plaintiff from Cohen's Children's Hospital, *see id.* ¶ 112; rather, the Amended Complaint's allegations focus on why she did not pick Infant-Plaintiff up from the hospital: The Amended Complaint alleges that Plaintiff "was a single mother with two young children sleeping at home and she could not leave them home alone to come pick up Infant-Plaintiff, and because it was the middle of the night and the middle of the

COVID-19 Pandemic, she did not feel comfortable waking her young children up and taking them to the hospital to pick up Infant-Plaintiff," *id.*  As a result, Infant-Plaintiff had to be escorted from the hospital back to Plaintiff's home.  *Id.* ¶ 113.  However, there are no allegations that Cudjoe knew the details of the story such that her statement to the court did not reflect the full extent of her knowledge about the events surrounding Infant-Plaintiff's discharge from Cohen's Children's Hospital.

Finally, Plaintiffs claim that Cudjoe lied when she stated that JCCA had determined that Infant-Plaintiff needed medication management to treat his ADHD.  *Id.* ¶ 130.  The relevant statement is contained in paragraph 1(d) of the Petition, which reads in part:  "JCCA observed the subject child in order to assess if the subject child needed medication management.  JCCA determined the child needed medication management to treat his ADHD."  Dkt. No. 38-3 at ECF p. 5 ¶ 1(d).  Plaintiffs' support for the claim that the statement was false comes from an allegation concerning the Initial Child Safety Conference on September 4, 2021 that Cudjoe attended and where an "ACS representative [or JCCA] stated that Infant-Plaintiff had been well behaved since returning to JCCA, Pleasantville, even without medication."  *Id.* ¶ 118; *see also id.* ¶ 131 (noting that "JCCA" not an ACS Representative "told Defendant Cudjoe during the September 4, [2020] Initial Child Safety Conference that Infant-Plaintiff had been well behaved since returning to Pleasantville, even without medication").  That allegation, however, even when viewed in the light most favorable to Plaintiffs, does not establish that Cudjoe's statement was false; Infant-Plaintiff could have at once been well behaved without medication and JCCA could have determined that medication to treat Infant-Plaintiff's ADHD was necessary.[14]

---

[14] The Amended Complaint also alleges that "a nurse practitioner with JCCA called Plaintiff and told her that [she] recommended keeping Infant-Plaintiff off of medication because he appeared to be doing well without medication in his system and that they would continue to monitor him

Further, that Infant-Plaintiff's behavior was stable at one point in time without medication does not mean that his behavior would always be stable without medication such that medication was not medically indicated.  Thus, the two statements are not inconsistent with each other and Cudjoe's knowledge of the statement made during the Initial Child Safety Conference does not render her statement in the addendum to the Petition false.

At absolute most, the Amended Complaint alleges that Cudjoe failed to present exculpatory evidence that would have been available to her, specifically the statement made at the Initial Child Safety Conference about Infant-Plaintiff's behavior when unmedicated. However, "[t]he Second Circuit has specially rejected that ACS caseworkers have a duty to present exculpatory evidence in Family Court proceedings." *Kurtz II*, 2023 WL 2648190, at *13 (collecting cases).  "On the contrary, as a charging instrument, a Petition is required merely to 'allege[]' 'facts sufficient to establish that a child is an abused or neglected,' not to canvass all relevant or potentially relevant evidence." *Id.* (quoting Family Court Act § 1031(a)); *see also* Family Court Act § 1031(d) ("[T]he petition shall allege facts sufficient to establish that the return of the child to the care and custody of his parent or other person legally responsible for his care would place the child in imminent danger of becoming an abused or neglected child.").  The Amended Complaint does not contain sufficient allegations to state a plausible claim that the Petition here did not.[15]

---

on a daily basis."  Dkt. No. 65 ¶ 124; *see also id.* ¶ 132.  However, there is no allegation that Cudjoe knew of that conversation.

[15] Though "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause," *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)), the Amended Complaint contains no allegations—and Plaintiffs do not argue—that Cudjoe's investigation was somehow deficient.  Cudjoe was "not obliged to exonerate plaintiff or uncover exculpatory evidence." *Lawrence v. City Cadillac*, 2010 WL 5174209, at *6 (S.D.N.Y. Dec. 9, 2010) (dismissing malicious prosecution claim because

II.      **Counts Two and Four: Substantive Due Process**

Count Two claims that Cudjoe "violated Plaintiffs' First Amendment right to intimate association by advocating for and/or ensuring the removal of Infant-Plaintiff from the care and custody of Plaintiff, advocating for and/or ensuring restriction of Plaintiff's parental access to Infant-Plaintiff, and advocating for and/or ensuring the restriction of residency of Infant-Plaintiff." Dkt. No. 65 at 154.  Count Four asserts a claim for a substantive due process violation against Cudjoe under the Due Process Clause of the Fourteenth Amendment because "Cudjoe was deliberately indifferent to and/or acted in reckless disregard of Plaintiff's [fundamental liberty interest in raising] Infant-Plaintiff free of State Interference absent proof of neglect, abuse, or unfitness." *Id.* ¶¶ 167–68.

As an initial matter, the City Defendants contend that Count Two is more appropriately brought under the Due Process Clause of the Fourteenth Amendment than under the First Amendment.[16]  The Court agrees.  "Where the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns . . . the Second Circuit has employed an analysis under the framework of the Fourteenth Amendment right to substantive due process."  *Garten v. Hochman*, 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) (collecting cases); *see also Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002) (noting that the right to intimate association "is constitutionally protected 'as a fundamental element of personal liberty'" and is appropriately analyzed as a substantive due process right).  Here, there are no allegations that Cudjoe retaliated against Plaintiff or Infant-Plaintiff based on the

───────────────

"Plaintiff also does not allege facts to support a conclusion that the defendants did not investigate as a reasonable person would have done.").

[16] Notably, Plaintiffs do not appear to challenge this notion. *See* Dkt. No. 90 at 9–12 (only arguing that Plaintiffs have stated a claim for a substantive due process violation and not arguing that Plaintiffs have also stated a claim for a First Amendment violation).

protected First Amendment activities of the other.  *See Agostino v. Simpson*, 2008 WL 4906140, at *9 (S.D.N.Y. Nov. 14, 2008) ("Where a plaintiff is allegedly retaliated against for the First Amendment activities of a family member and asserts a claim based on intimate association, the courts in this Circuit have considered the claim as deriving from the First Amendment."); *see also Uwadiegwu v. Dep't of Soc. Servs. of the Cnty. of Suffolk*, 91 F. Supp. 3d 391, 397 (E.D.N.Y. 2015), *aff'd*, 639 F. App'x 13 (2d Cir. 2016) (collecting cases) (same).  Thus, the Court will analyze both Counts Two and Four under the substantive due process framework for intimate family association.

The Amended Complaint alleges that Plaintiff's constitutional right to intimate association and to raise her child free from the undue intrusion of the state was violated because Cudjoe "advocat[ed] for and/or ensur[ed] the removal of Infant-Plaintiff . . . despite exculpatory evidence undermining the allegations made" in the family court proceeding.  Dkt. No. 65 ¶¶153–55.  The Amended Complaint further alleges that Plaintiff's fundamental liberty interest in raising her child free from government interference was violated by initiation of the neglect proceeding, "made with no reasonable basis and deliberate indifference to the exculpatory evidence," and the false statements contained in Cudjoe's supporting affidavit to the Petition.  *Id.* ¶¶ 167–71.[17]  The City Defendants argue that these allegations "fail to show that ACS' conduct

---

[17] Plaintiffs' memorandum of law in opposition to the City Defendants' motion to dismiss attempts to recharacterize her substantive due process claims as stemming at least in part from Infant-Plaintiff's placement with three foster care agencies and the agencies' failure to address Infant-Plaintiff's mental-health issues.  *See* Dkt. No. 90 at 10. However, "[i]t is well-settled that a plaintiff 'cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss.'" *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) (second and third alterations in original) (quoting *K.D. v. White Plains Sch. Dist.*, 921 F.Supp.2d 197, 209 n. 8 (S.D.N.Y.2013)).  Even if the Court could conclude that Plaintiffs' new theory of liability were properly before it, there are no allegations that Cudjoe was involved in Infant-Plaintiff's placement at any of the foster care agencies or in the development of Infant-Plaintiff's treatment plans while there.  Plaintiffs thus would not be able

was shocking, arbitrary, and egregious, especially given that the removal was effectuated

pursuant to a valid family court order," as required to maintain a substantive due process claim.

Dkt. No. 84 at 8.  The Court concludes that Plaintiffs have failed to state a claim for a violation

of their substantive due process rights.[18]

"The interest of a parent in the custody of his or her child is 'a fundamental,

constitutionally protected liberty interest.'" *Grullon*, 2021 WL 981848, at *6 (quoting *Gottlieb v.*

*Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see Southerland v. City of New York*,

680 F.3d 127, 142 (2d Cir. 2012) ("Parents . . . have a constitutionally protected liberty interest

in the care, custody and management of their children" (quoting *Tenenbaum v. Williams,* 193

F.3d 581, 593 (2d Cir. 1999)) (alteration omitted)).  A "deprivation of this interest is actionable

on a substantive due process theory." *Southerland*, 680 F.3d at 152.

"To establish a violation of substantive due process rights, a plaintiff must demonstrate

that the state action was so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience." *Id.* at 151–52 (internal quotation marks omitted) (quoting *Okin*,

577 F.3d at 431).  In the child custody context, a plaintiff must meet both elements of a two-

---

to make out a Section 1983 claim against Cudjoe on those grounds.  *See Brandon v. Kinter*, 938
F.3d 21, 36 (2d Cir. 2019) ("It is well settled in this Circuit that personal involvement of
defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §
1983." (internal citations and quotation marks omitted)).

[18] The Court notes that Infant-Plaintiff cannot bring an independent claim for violation of his
substantive due process rights.  "Where another provision of the Constitution provides an explicit
textual source of constitutional protection, a court must assess a plaintiff's claims under that
explicit provision and not the more generalized notion of substantive due process."
*Southerland v. City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012) (quoting *Kia P. v.*
*McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000)).  "For child removal claims brought by the child,"
the Second Circuit has "concluded that the Constitution provides an alternative, more specific
source of protection than substantive due process. When a child is taken into state custody, his or
her person is "seized" for Fourth Amendment purposes." *Id.* at 143.  Thus, any claim by Infant-
Plaintiff must lie under the Fourth Amendment of the United States Constitution.  *Id.*

prong test.  First, the removal of the child from his parent's custody must be done without reasonable basis.  *Id.* at 152.  The Second Circuit has recognized that the constitutionally protected interest parents enjoy "in their integrity [must be] counterbalanced by the compelling government interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves," *Wilkinson*, 182 F.3d at 104, and that "a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected," *Southerland*, 680 F.3d at 152; *see Estiverne*, 833 F. Supp. 2d at 372.

Second, the "interference with a plaintiff's liberty interest must be severe before it rises to the level of a substantive constitutional violation."  *Southerland*, 680 F.3d at 152.  "[B]rief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal."  *Id.* at 153 (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir.), *certified question accepted*, 1 N.Y.3d 538, 807 N.E.2d 283 (2003), *and certified question answered*, 3 N.Y.3d 357, 820 N.E.2d 840 (2004)).  "Once court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child."  *Id.* (internal quotation marks and citation omitted).

The Amended Complaint does not plead a substantive due process violation, either in Count Two or Count Four.  The removal of Infant-Plaintiff from Plaintiff's care and custody on September 30, 2020 was effected pursuant to court order.  *See* Dkt. No. 38-4.  That order, which concluded that continuation of Infant-Plaintiff in his mother's home would be "contrary to the

welfare and best interests of the child," *id.* at ECF p. 1, finds a reasonable basis in the facts recited in the addendum to the Petition, including that Plaintiff failed to ensure Infant-Plaintiff was taking necessary medication, Plaintiff threatened Infant-Plaintiff with a bat, and Plaintiff refused to pick Infant-Plaintiff up from Cohen's Children's Hospital when he was discharged, Dkt. No. 38-3 at ECF pp. 5–6. "Because Plaintiff[] [was] not separated from [Infant-Plaintiff] until after a court order had issued, Plaintiff['s] substantive due process claim against [Cudjoe] fails." *Black v. Ranley*, 2018 WL 2766138, at *8 (S.D.N.Y. June 8, 2018).

There is some case law that suggests that court confirmation of a removal does not relieve a case worker from liability when the judicial decision is itself based on false information provided by the case worker. *See Estiverne*, 833 F. Supp. 2d at 374 ("[W]hen the facts upon which the judicial tribunal relies are themselves false or misleading, court confirmation will not suffice to show that the caseworker's conduct had an objectively reasonable basis."). However, the conclusory allegations that the Petition was allegedly based on false information are not sufficient to state a claim for a substantive due process violation. The Second Circuit "has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (Sotomayor, J.). "[T]he reasonable basis test" requires that the decisions of case workers to "declare claims of abuse . . . must be consistent with some significant portion of the evidence before them." *Id.* at 108; *see also Southerland*, 680 F.3d at 152 ("[B]ecause the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting

a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected.").

"Where a case worker's action concerning removal of infant from parent's custody is 'incorrect or ill-advised' or where an investigation is 'faulty,' such deficiencies do not rise to the level of an unconstitutional investigation, provided that the case worker's action is 'consistent with some significant portion of the evidence before [her].'" *Orlik v. Dutchess Cnty.*, 603 F. Supp. 2d 632, 647 (S.D.N.Y. 2009) (quoting *Bukovinsky v. Sullivan Cnty. Div. of Health & Fam. Servs.*, 2008 WL 191018, at *8 (S.D.N.Y. Jan. 16, 2008)).  While "[t]he government must conduct a sufficient investigation into the alleged neglect or abuse it relies upon to establish a reasonable basis for its action," *Graham v. City of New York*, 869 F. Supp. 2d 337, 350 (E.D.N.Y. 2012), "a faulty investigation does not necessarily rise to the level of an unconstitutional investigation," *Wilkinson*, 182 F.3d at 106 (holding that notwithstanding deficiencies in investigation—subject child's express claims raised significant doubt as to the likelihood of abuse; there was an absence of any medical evidence; investigator interviewed the child only once, and used leading questions; investigator sought corroboration from a child psychiatrist who had met with the child only two or three times—caseworkers had a reasonable basis to suspect abuse because the investigation "generated significant information supporting a finding of abuse").  Accordingly, courts find constitutional violations only in "obvious extremes," such as when caseworkers "[ignore] overwhelming exculpatory information or [manufacture] false evidence."  *Wilkinson*, 182 F.3d at 104.

The allegations of the Amended Complaint do not present the "obvious extremes" necessary to find a substantive due process violation.  As noted, the Amended Complaint at most alleges that Cudjoe failed to consider exculpatory information that she knew—specifically a

statement made at the Initial Child Safety Conference suggesting that Infant-Plaintiff's behavior was well regulated without medication—that might have helped to explain why Infant-Plaintiff was not taking his medication.  *See supra* 21–23.  However, the failure to explicitly consider or to disclose to the family court that Infant-Plaintiff's behavior was stable when he was not medicated does not represent the "overwhelming exculpatory evidence," *Wilkinson*, 182 F.3d at 105, necessary to find a substantive due process violation.  *See, e.g.*, *Estiverne*, 833 F. Supp. 2d at 373 (finding due process violation where defendant doctor "both ignored significant exculpatory evidence *and* manufactured a false or reckless diagnosis" (emphasis in original)); *Hirsch v. Otsego Cnty. Dep't of Soc. Servs.*, 1992 WL 59178, at *4–5 (N.D.N.Y. Mar. 12, 1992) (finding that a reasonable jury could conclude that a case worker's bias against plaintiff and failure to pursue "credible and believable" leads were "so egregious that it shocked the conscience").

Accordingly, Counts Two and Four fail as a matter of law.

## III.   Count Five: Right to a Fair Trial

Count Five claims that Cudjoe violated Plaintiffs' right to a fair trial because Cudjoe created false information that was likely to influence the trier of fact's decision and shared that information with the ACS attorney prosecuting the Petition.  Dkt. No. 65 ¶¶ 174–78.  An individual's constitutional right to a fair trial is violated if "(1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  The right to a fair trial is guaranteed by "the Due Process Clauses" of the Constitution and the Sixth Amendment "defines [its] basic elements."  *See Strickland v. Washington*, 466 U.S. 668, 685 (1984); *see also Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Ying Li v. City of New York*, 246 F. Supp. 3d 578,

627 (E.D.N.Y. 2017) ("The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. Constitution."). "Falsification of evidence or other egregious conduct resulting in a denial of a fair trial constitutes a violation of procedural due process." *Reyes v. City of New York*, 992 F. Supp. 2d 290, 297 (S.D.N.Y. 2014).[19]

The City Defendants argue that, to the degree the claim is properly before the Court,[20] Plaintiffs' right to a fair trial was satisfied because the "judicial process *was* employed" and thus Plaintiffs' have failed to state a procedural due process claim. Dkt. No. 84 at 10. Plaintiffs counter that Plaintiffs' right to a fair trial was violated because Cudjoe, the investigating official, fabricated evidence that resulted in the involuntary remand of Infant-Plaintiff to the care and custody of ACS. Dkt. No. 90 at 13. The Court finds that Plaintiffs have failed to state a claim for violation of their right to a fair trial.

The Second Circuit has held that "[i]nformation may be 'false' [for the purposes of the right to a fair trial analysis] if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015); *id.* at 547 (holding that "government officials

---

[19] There is an open question of whether the right to a fair trial exists outside of the criminal context. *See Baron v. Lissade*, 2021 WL 4407836, at \*5 (E.D.N.Y. Sept. 27, 2021) ("[T]he Second Circuit 'has never recognized a constitutional right to be free from fabrication of evidence outside of the criminal context.'" (quoting *Rolon v. Henneman*, 443 F. Supp. 2d 532, 538 (S.D.N.Y. 2006), *aff'd*, 517 F.3d 140 (2d Cir. 2008))). However, because neither party raises the issue, the Court does not address whether a child's involuntary remand to the care of a government agency implicates sufficient constitutional rights to support a claim for violation of a right to a fair trial.

[20] The Court does not reach the question of whether the right to a fair trial is duplicative of the malicious prosecution claim because it finds that Plaintiffs have not adequately pled that their right to a fair trial was violated, but it notes that the two claims arise from different provisions of the Constitution and the Second Circuit has permitted, without directly deciding the question, both claims to be asserted simultaneously. *See Ricciuti*, 124 F.3d at 130 (2d Cir. 1997); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010).

may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly"); *see also Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021) (same).  Here, Amended Complaint alleges sufficient facts to establish that Cudjoe failed to share a single piece of evidence with the family court of which she had knowledge:  that, during the Initial Child Safety Conference Cudjoe learned that Infant-Plaintiff had been well-behaved while not on medication since his return to Pleasantville.  *See* Dkt. No. 65 ¶¶ 118, 131; *see also supra* pp. 19–23.  However, this allegation is insufficient to state a claim for violation of the right to a fair trial because the omission of the information the Cudjoe learned during the Initial Child Safety Conference does not, as the Court concluded, render any of the statements that ACS lawyers presented to the family court false.  The relevant statement that was contained in Cudjoe's addendum to the Petition was that "JCCA determined the child needed medication management to treat his ADHD."  Dkt. No. 38-3 at ECF p. 5 ¶ 1(d).  However, that Infant-Plaintiff was doing well while off of his medication does not mean that Infant-Plaintiff's behavior would always be well regulated without medication or that JCCA had determined that the medication was not medically indicated.  Because the Amended Complaint is devoid of allegations that the information Cudjoe provided to the family court was rendered false by the omission of evidence of which she had knowledge, Plaintiffs have failed to state a claim for a violation of the right to a fair trial.  *See Harasz v. Katz*, 327 F. Supp. 3d 418, 434 (D. Conn. 2018) (concluding that omission that did not render a statement false could not serve as the basis of a right to a fair trial violation).

## IV.    Qualified Immunity

Plaintiffs' federal claims—which are all brought solely against Cudjoe—fail for an independent reason:  Cudjoe is entitled to qualified immunity.  "ACS caseworkers and their superiors are generally entitled to qualified immunity from claims under Section 1983 if it was

objectively reasonable for the caseworkers to believe their conduct did not violate clearly established statutory or constitutional rights of which a reasonable caseworker would have known." *V.S. v. Muhammad*, 595 F.3d 426, 430–31 (2d Cir. 2010).  As noted, the Second Circuit "has adopted a standard governing case workers," *Wilkinson*, 182 F.3d at 104, which requires that the decisions of case workers to "declare claims of abuse . . . must be consistent with some significant portion of the evidence before them," *id.* at 108; *see also Southerland*, 680 F.3d at 152 (noting that the reasonable basis standard also applies in the neglect context).

Here, the allegations of the Amended Complaint do not establish that the statements Cudjoe provided in the Petition were inconsistent with the evidence before her.  She had evidence that Infant-Plaintiff was not receiving his medication, that he had been physically threatened, and that he was not being cared for in other ways.  *See* Dkt. No. 38-3 at ECF pp. 5–6. Though "qualified immunity is improper in light of credible evidence of material perjury or fabricated evidence," *Walker v. City of New York*, 63 F. Supp. 3d 301, 313 (E.D.N.Y. 2014), *aff'd*, 621 F. App'x 74 (2d Cir. 2015) (collecting cases), there are no such allegation here.  As noted, the Amended Complaint at most alleges that Cudjoe did not disclose certain evidence to the family court in the Petition, specifically a statement made at the Initial Child Safety Conference suggesting that Infant-Plaintiff's behavior was well regulated without medication. *See supra* 21–23.  The Second Circuit "has found no constitutional violation where caseworkers allegedly committed 'sins of commission and omission in what they told and failed to tell . . . the Family Court Judge.'"  *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (quoting *van Emrik v. Chemung Cty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir.1990)) (noting that, in the child abuse context, an "extreme misstatement" is necessary "to override the necessary freedom of action that qualified immunity accords caseworker defendants" and finding that failure of

caseworkers to provide information to the family court about the absence of one parent during the time when the alleged abuse took place did not represent such an "extreme misstatement"). Thus, Cudjoe is entitled to qualified immunity on the malicious prosecution, substantive due process, and right to a fair trial claims for the statements she swore to in the addendum to the Petition.

## V.    State Law Claims

The City Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims because the "federal claims against City Defendants are not viable." Dkt. No. 84 at 13. Plaintiffs request that the Court retain jurisdiction over the state-law claims, but only insofar as the "Plaintiffs have viable federal claims." Dkt. No. 90 at 15. Having dismissed the federal claims, the Court declines to exercise jurisdiction over Plaintiffs' state-law claims.

Under 28 U.S.C. § 1367(c), a federal court "may decline to exercise supplemental jurisdiction over a [supplemental state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). If "a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction" over the remaining related state-law claims if they derive from the same common nucleus of operative fact. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). As a general matter, "[w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,

the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* (footnote omitted) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966)); *see also Klein & Co. Futures v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."). "At this early stage of litigation, when the parties have not spent significant time or resources litigating the dispute in this forum, the balance of factors weigh towards declining to exercise jurisdiction." *Alfonso v. Mougis Logistics Corp.*, 2021 WL 5771769, at *4 (S.D.N.Y. Dec. 6, 2021).

## VI.    Defendant JBFCS' Motion to Dismiss

JBFCS moves to dismiss the claims against it. As an initial matter, JBFCS dedicates a substantial portion of its briefing arguing that it did not act under color of state law and thus the 42 U.S.C. § 1983 claims against it must be dismissed. *See* Dkt. No. 81 at 4–7. However, the federal claims are only brought against Cudjoe, and are not brought against any of the foster care agencies named in the Amended Complaint. *See* Dkt. No. 65 (Counts One, Two, Four, and Five); *see also* Dkt. No. 86 at 3 n.1 ("Plaintiff[s] did not bring any [Section] 1983 Claims against JBFCS, and accordingly this motion point is moot."). Because there are no federal claims against JBFCS, the Court does not address JBFCS's arguments with respect to 42 U.S.C. § 1983.

JBFCS also seeks to dismiss Plaintiffs' negligence claim against it and SCO's cross-claims for contribution and indemnification. Dkt. No. 81 at 7–8. Because the Court has declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims, JBFCS's motion to dismiss the negligence claim and SCO's cross-claims is denied as moot.

**CONCLUSION**

The City Defendants' motion to dismiss with respect to Counts One, Two, Four, and Five of the Amended Complaint is GRANTED with prejudice.[21]  Because the Court will not exercise jurisdiction over Plaintiffs' state-law claims, JBFCS's motion to dismiss is DENIED AS MOOT. Accordingly, Counts Three, Six, and Seven, alleging state-law claims, are dismissed without prejudice.

The Clerk of Court is respectfully directed to close Dkt. Nos. 79, 83 and to close this case.


SO ORDERED.

Dated: September 26, 2023
      New York, New York                                 LEWIS J. LIMAN
                                             United States District Judge

---

[21] Plaintiffs do not request leave to replead and do not "identify [any] additional facts or legal theories that [they] might assert if given the opportunity to replead.  For this reason and because the Court concludes that any amendment would be futile," Counts One, Two, Four, and Five of the Amended Complaint against the City Defendants are dismissed with prejudice.  *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 401 (S.D.N.Y. 2022), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022).